MYERS, P.J.,
for the Court:
¶ 1. Oscar and Audrey Lestrade were married in 1960. The marriage lasted for twenty-nine years until they divorced in 1989 under the irreconcilable differences statute. Seven children were born to the marriage, including Mary Elizabeth (Beth), who suffers from Down Syndrome. Most of the children were grown at the time of the divorce, but Beth continued to live with Audrey into adulthood, visiting her father twice a month. Shortly after the divorce, Oscar remarried; Audrey never did.
¶ 2. As part of their irreconcilable differences divorce, the Lestrades entered into a property settlement agreement. The agreement addressed the issues of custody, visitation, child support, alimony, and property division. Among other things, it provided that Oscar “[would] pay one-half of his Civil Service Retirement to [Audrey].”
¶ 3. On January 28, 2008, Audrey filed a complaint for modification of the divorce decree. She alleged that she and Beth were subsisting on approximately $1,700 per month in social security payments[1] and that they were relying on financial assistance from her other children to make ends meet. Audrey alleged that she had expected to begin receiving Oscar’s retirement when he reached sixty-five years of age, but Oscar was now seventy-one and had not yet retired. Since Oscar had not retired, she had not received any retirement benefits. Audrey sought one-half of what Oscar’s retirement benefits would be, if he retired, and to extend that award retroactively to include lost retirement income since Oscar’s sixty-fifth birthday.
¶ 4. The chancellor held a hearing on the motion, where both parties briefly testified. Oscar was earning approximately $78,000 per year as a civilian employee of the Navy and was receiving about $12,000 per year in social security benefits. At the age of sixty-five, he had been eligible for about $40,000 per year in retirement benefits; by seventy-one, this had increased to between $45,000 and $47,000. Oscar averred that he wanted to retire, but he could not afford to do so. He stated that his finances had suffered since Hurricane Katrina and that his prospects for employ *642 ment in the private sector were poor. Oscar did not believe he would be able to find other work.
¶ 5. Oscar testified that his position had no mandatory retirement age. When he agreed to the property settlement, he believed the agreement as written preserved his right to retire when he chose to do so and that he would not be obligated to pay Audrey her share of the retirement benefits until he actually received those benefits. Audrey, on the other hand, testified that under the property settlement agreement she believed she would begin receiving the benefits “when Oscar reached the age of retirement, which we assumed was [sixty-five].”
¶ 6. The chancellor found that intent of the parties was that Audrey would receive half of Oscar’s retirement benefits “at a reasonable and customary time,” which the chancellor found to be when Oscar reached sixty-five years of age. The chancellor concluded that the circumstances required an “equitable modification” of the agreement and that Audrey was entitled to the equivalent of one-half of the retirement benefits Oscar could have received since turning sixty-five. “To do otherwise would deprive [Audrey] of the benefit of her bargain and provide [Oscar] an unexpected and inequitable windfall.”
¶ 7. The chancellor ordered Oscar to pay one-half of the retirement benefits he had been eligible to receive over the last five years — which the chancellor determined to be $125,000 including interest — and to pay one-half of the continuing benefits Oscar would receive if he retired, $1,875 per month. The chancellor’s order also provided that Oscar could pay only $300 per month toward the back retirement benefits.
¶ 8. On appeal, Oscar argues that the chancellor erred by modifying the property settlement agreement absent fraud, duress, or unconscionability. He also argues that his obligation to pay Audrey one-half of his retirement benefits should be adjusted to reflect the increase in the benefit resulting from the approximately twenty years he continued to work after the divorce.
STANDARD OF REVIEW
¶ 9. “In domestic relations cases, [the appellate court’s] scope of review is limited by the substantial evidence/manifest error rule.” Samples v. Davis, 904 So.2d 1061, 1063-64 (¶9) (Miss.2004) (citing Jundoosing v. Jundoosing, 826 So.2d 85, 88 (¶10) (Miss.2002)). We “will not disturb the chancellor’s opinion when [it is] supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Id. at 1064 (¶ 9) (quoting Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996)). However, questions of law are reviewed de novo. Amiker v. Drugs for Less, Inc., 796 So.2d 942, 945 (¶ 7) (Miss.2000).
DISCUSSION
1. Modification of the Property Settlement Agreement
¶ 10. Property settlement agreements entered into by divorcing parties and incorporated into the divorce decree are not subject to modification, except in limited situations. Townsend v. Townsend, 859 So.2d 370, 376 (¶21) (Miss.2003). “A true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character.” East v. East, 493 So.2d 927, 931-32 (Miss.1986). These agreements are “fixed and final, and may not be modified absent fraud or [a] con *643 tractual provision allowing modification,” Weathersby v. Weathersby, 693 So.2d 1848, 1352 (Miss.1997), or where, because of a scrivener’s error, the instrument does not reflect the actual agreement of the parties, Ivison v. Ivison, 762 So.2d 329, 335-36 (¶ 21) (Miss.2000). “[W]hen parties in a divorce proceeding have reached an agreement that a chancery court has approved, we will enforce it, absent fraud or overreaching, and we take a dim view of efforts to modify it just as we do when persons seek relief from improvident contracts.” Id. at 334 (¶ 14) (citing Bell v. Bell, 572 So.2d 841, 844 (Miss.1990)).
¶ 11. The provision of the property settlement agreement at issue reads in its entirety: “Husband will pay one-half of his Civil Service Retirement to the Wife and will provide the proper and necessary documentary proof to effect this payment.” Audrey concedes that the property settlement agreement, as written, requires that Oscar actually retire and begin receiving benefits before she is entitled to her half.
¶ 12. The chancellor modified the property settlement agreement after finding that the intent of the parties “was that [Audrey] would begin to receive one-half of [Oscar’s] Civil Service Retirement at a reasonable and customary time which the Court finds to be at [Oscar’s] reaching age 65.” Although the chancellor styled his decision an “equitable modification,” at first blush it appears that with this finding he could have reformed the contract on a mistake theory. The record, however, simply cannot support this.
¶ 13. Oscar testified that, leading up to the divorce, he was not represented by an attorney and had little contact with Audrey. He stated the agreement was drafted by Audrey’s attorney and offered to him as a divorce settlement, which he accepted. Thus, Oscar’s understanding of the property settlement stemmed only from the text of the written agreement. He stated that his understanding was that Audrey would receive her half of the benefits only when those benefits were paid to him — that is, beginning at the time he retired, which remained his decision. Audrey testified that her understanding of the agreement was essentially the same, but she added that they had “assumed” Oscar would retire at sixty-five. Oscar categorically denied that this had been his intent or understanding of the agreement. On subsequent examination by the chancellor, Audrey stated that she could not recall discussing the retirement provision with Oscar before the divorce.
¶ 14. To reform a contract, mutual mistake must be proven beyond a reasonable doubt. Steinwinder v. Aetna Cas. and Sur. Co., 742 So.2d 1150, 1155 (¶ 24) (Miss.1999). That burden was simply not met in this case. The chancellor’s finding of the “intent” of the parties seems instead to describe their expectation of when Oscar would retire, as described by Audrey. But even assuming this had been shown to be the mutual understanding of the parties, mistaken expectations about the future are not grounds to set aside or reform a contract — “the mistake must relate to a past or present material fact.” White v. Cooke, 4 So.3d 330, 334 (¶ 15) (Miss.2009). This is particularly true where the future event is inherently uncertain; even assuming Oscar was expected to retire at sixty-five, he could have died or otherwise failed to become vested in the retirement system, and Audrey would not have collected any of the expected benefits. We conclude that the chancellor’s modification cannot be defended as a reformation based on mutual mistake.
¶ 15. That said, the chancellor styled his order an “equitable modification,” and he appears to have relied on a *644 series of decisions where our courts have allowed some degree of modification based only on equitable considerations.
¶ 16. The Mississippi Supreme Court has recognized that “courts of equity have certain discretionary power in the matter of decreeing the specific performance of contraets[,] and they may and should make equitable modifications in the form of relief granted where to do otherwise would result in undue hardship or injustice.” Dalton v. Dalton, 874 So.2d 967, 971 (¶ 10) (Miss.2004) (quoting Estate of Kennington v. Kennington, 204 So.2d 444, 450 (Miss.1967)).
¶ 17. The supreme court has permitted equitable modification of property settlements in certain limited circumstances. In Kennington, 204 So.2d at 450, periodic alimony was converted to its present value to facilitate the administration of the husband’s estate.[2] In R.K. v. J.K., 946 So.2d 764, 773-74 (¶¶ 20-22) (Miss.2007), an equitable modification was permitted when the husband forced the wife to breach a nondisclosure agreement to defend herself in a lawsuit he had filed. In Dalton, 874 So.2d at 972 (¶ 13), the chancellor was permitted to extend a deadline for certain real estate transactions when they could not be completed in time because of an ambiguity in the property settlement agreement.
¶ 18. None of those decisions can support the chancellor’s modification in the present case. Instead, it appears that the chancellor relied on our decision in Morgan v. Morgan, 744 So.2d 321 (Miss.Ct.App.1999). There, the husband agreed to pay the insurance, registration, and monthly note for the wife’s vehicle. The obligation was to end once the loan was paid off and the husband had transferred title of the vehicle to the wife. Shortly after the divorce, the vehicle was totaled in an accident and the loan balance was paid off by the insurance. Under a literal reading of the property settlement agreement, the husband was only required to provide for that specific vehicle. This, however, would have left the wife without transportation and afforded the husband an $8,000 windfall. Id. at 321-22 (¶¶ 1-3). We held that the chancellor could have crafted an “equitable remedy” that would essentially require the husband to continue paying for “a” vehicle rather than “the” specific vehicle, provided that his total obligation remained approximately the same as originally contemplated. Id. at 324 (¶¶ 13-15).
¶ 19. Audrey argues that Morgan permits a chancellor to modify a property settlement agreement to ensure that a party receives the expected benefit of her bargain. This reading is too broad. Instead, we think Morgan is limited to the facts it presented — the property settlement agreement presupposed the continued existence of the vehicle and was frustrated by its loss. The husband could not provide title to that particular vehicle, free and clear, as he was required to do. We allowed a slight modification of the agreement to preserve the parties’ obligations as originally contemplated. The present case is not comparable — Oscar was only expected to retire at sixty-five, he was not required to do so.
¶ 20. We cannot fault the chancellor for finding that Oscar’s decision not to retire has benefitted him at Audrey’s expense or that Audrey had expected Oscar to retire at a customary age. But, although we recognize that the chancellor may order an equitable modification of divorce settlements under certain circum *645 stances, modification may not be granted based on expectations alone. Instead, the rule remains that it requires proof of mistake, fraud, duress, or unconscionability. As none of these are present in this case, the chancellor’s judgment awarding Audrey past and future retirement benefits must be reversed and rendered.
2. Division of Retirement Benefits
¶ 21. In his final issue, Oscar urges that the chancellor erred in holding that Audrey was entitled to a full one-half of his retirement benefits. Oscar worked toward the retirement for seventeen years during the marriage; after the divorce, he has continued for another twenty. The value of his retirement benefit, when he retires, will depend on his total years of service and the- higher salary he has earned after the marriage. Oscar argues that some portion of his retirement benefit is not marital property and is not subject to the property settlement agreement.
¶ 22. We disagree. Oscar is correct that, in determining the value of marital property for equitable distribution, a court should exclude the part of the benefit that derives from non-marital contributions. See Prescott v. Prescott, 736 So.2d 409, 413-14 (¶¶ 12-19) (Miss.Ct.App.1999). But this is not equitable distribution; we are addressing a property settlement agreement, a contract between the parties. Oscar was free to contract away more of his retirement benefit than might have been subject to equitable distribution. The property settlement agreement is clear and unambiguous on this point: Audrey is entitled to one-half of Oscar’s retirement benefit. This issue is without merit.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
KING, C.J., LEE, P.J., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.

. Both Audrey and Beth were receiving social security benefits; Audrey received about $1,100 and her daughter about $600.

. The divorce settlement in that case specifically provided that the alimony payments would continue after the husband’s death.